## CIRCUIT COURT OF WARREN COUNTY

Forbush

   v.

Poe

November 17, 1986

Case No. (Chancery) H86005003

By JUDGE HENRY H. WHITING

The Court must decide whether the defendants have a right of way for ingress and egress over the complainants' property located in a remote mountainous area of Warren County. The right of way was allegedly created in a deed from the common grantor of both parties dated October 1, 1881, providing in part: "It is distinctly understood that the right of way for a road is herein reserved as ingress and egress to the said Woodwards' lands lying back of said tract." (Complainant's Exhibit 1.) This reservation was then noted in the deed to the defendants' predecessors dated October 29, 1883, in the following language: "And the said J. B. Beatty, had the right of way through the O. K. Brown tract." It is never mentioned in the subsequent deeds to either tract of land for some period of time. However, the servient owners' predecessor had the property surveyed in 1955 and the plat shows a dashed line running just north of the southern boundary of this property to the dominant owners' property (Complainant's Exhibit 4), and a subsequent survey prepared for attachment to a deed in the chain of title to the servient property dated November 11, 1981, contained two notations: (1) labeling an old abandoned road as shown

on the survey referred to above, and (2) a right of way as recited in Deed Book N at page 98 and Deed Book P at page 41, those being the two references to the claimed rights of way created by deed dated October 1, 1881, and conveyed by deed dated December 29, 1883. (Defendant's Exhibit 6.) Reference to the right of way emerges in the dominant owner's tract in his predecessor's deed dated November 1, 1969.

Apparently neither property was improved when the alleged right of way was created and the dominant tract has never had improvements upon it but the servient tract did later have two small houses built on it. In 1968 when the servient owners' immediate predecessor was building a new house upon the property, he stayed in one of the smaller older houses on weekends during the period of construction from 1968 to 1973 and thereafter in the new house on weekends until 1979, when he retired and lived there permanently until 1983. He testified he had never seen anyone cross his property to the dominant owners' property until after the dominant owners acquired the property in 1969 when they began walking across his property to reach their property and later cleared a path from his road, claiming the right of way, which he said he had never heard of before, and telling him of their plan to use heavy equipment to work on the right of way, which never materialized, although some light clearing was done by hand. He told them he doubted the existence of the right of way since it was not shown in his deed but he did not stop them from clearing and crossing his property.

The dominant owners, on the other hand, testified they used the roadway regularly from their purchase in 1969 either by walking across it to get into the property to hunt and to hike or crossing the property a number of times in vehicles, one of his dominant owners, Robert Poe, having done so earlier with his father in 1954 or 1955. Robert Poe also testified that they cleared a section of the road used in 1972 and every two or three years thereafter, and he said while the then-servient owner would not concede the right of way he did request that they use the new roadway that he had constructed, which crossed the old roadway at points and deviated at points, which they did in accordance with his request. He also testified that the servient owner saw them clearing the right of way on one occasion and made no objection.

Joseph Brogan, a surveyor called by the dominant owners, produced a plat locating the right of way through several points running just north of the southern boundary of the servient tract in the location claimed by the dominant owners, pointed out a number of places where the servient owners' new driveway crossed it and indicated that at other points the use of the right of way had ceased because the new roadway deviated therefrom. The dominant owners testified that they used the relocated roadway at the request of the servient owners and, indeed, testified without contradiction that they had a key to the gate at the entrance to this roadway given to them by the servient owners.

The servient owner contends that the alleged dominant owners have no right of way for a number of reasons, which will be disposed of herein as stated.

(1) *The right of way is too vague to be valid.*

The contention is that the right of way is not sufficiently described to be enforceable. The difficulty with the contention is that both cases cited for the proposition that a reservation of *land* must be sufficiently definite to be valid, *Chesapeake Corporation* v. *McCreery*, 216 Va. 33 (1975), and *Butcher* v. *Creel's Heirs*, 50 Va. (9 Gratt.) 201 (1852), involved reservation of land, not rights of way or easements. *Eureka Land Co.* v. *Watts*, 119 Va. 506 (1916), and, indeed, *Cushman Virginia Corp.* v. *Barnes*, 204 Va. 245 (1963) (cited and furnished by the servient owner to the Court), established the proposition that if the right of way is not adequately described in the grant the servient owner may locate it on the ground, but if he does not then the dominant owner may do so unless prompt objection is made by the servient owner. The facts sufficiently establish that a right of way was located and used in this case although we do not know which owner did so.

(2) *The easement was not properly recorded.*

Although that is the caption of the servient owners' argument in their memorandum, its thrust is that there was no mention made of the right of way for more than sixty years in the record books and therefore they had no notice thereof. No authority is cited for the proposi-

tion that the notice provisions only apply to deeds recorded within a sixty-year title search period.

It should be noted that there was *no* title search in this case; when the servient owner bought the property he merely had an attorney "look over" the closing papers. That attorney warned him there was no title search. Also, there was a notation of an "abandoned road" on the plat attached to his deed, which he says he did see in the pile of papers handed him at closing. The dominant owner cannot be charged with the failure of the servient owner or his attorney to make inquiry which would have disclosed this right of way.

Independent research reveals that in those States which have adopted Marketable Title Acts this argument would have validity since the right of way would have to be *re*-recorded within the statutory time to give such notice to a title searcher. P. Basye, *Clearing Land Titles*, section 172 (2d ed. 1970). Virginia has no such act. The customary sixty-year search period has no statutory basis; it is believed to be derived from the custom in England, which came from the English Marketable Title Act of sixty years in existence in the nineteenth century. C. Maupin, *Marketable Title to Real Estate*, § 172 at 161 (1896); Sugden, *The Law of Vendors and Purchasers of Estates* 366 (1873). In my opinion, unless the easement is lost by abandonment or by some other method it cannot be lost simply by not being mentioned or recorded within the sixty-year period. This is one of the reasons for title insurance; title insurance companies are willing to risk this as an actuarial matter to keep lawyers from tracing title back to the original source.

The Court believes that any person is charged with notice of any easement reserved at any time in the chain of title back to the common grantor who may have created the reservation in the absence of an abandonment or release of the reservation. Obviously the easement did pass to the successors, whether mentioned in the deed or not, unless expressly reserved by the language of the deed, Virginia Code § 55-50; *Corbett* v. *Ruben*, 223 Va. 468 (1982), and, indeed, one of the very cases cited by the servient owner embodies that principle, *Norfolk & Western Railway* v. *Obenchain*, 107 Va. 596 (1907).

**(3)** *The right of way has been extinguished by abandonment.*

Quoting the servient owners' brief:

> In order to show abandonment of an easement which has been created by grant, there must be acts by the owner showing an intention to abandon, or an adverse use by the owner of the servient tenement acquiesced in by the owner of the dominant estate.

And in the reply brief:

> As stated in *Lindsey* v. *Clark*, 193 Va. 522, 69 S.E.2d 342 (1952), the burden of proof is by clear and unequivocal evidence to establish abandonment of an easement. (*Id.* at 13.)

Suffice it to say that the evidence is wholly lacking to establish any abandonment by the dominant owners. There is no evidence from the servient owners to show the extent or lack of use of the property during the long period from the creation of the easement until his immediate predecessor acquired the property in 1968. Contrasted with that is the evidence from the dominant owners showing an occasional use of the property by persons using the dominant tract by vehicle and by foot. The notation of an old abandoned road on the plat was a surveyor's conclusion but there is nothing to show how he reached that conclusion except by the condition of the road on the ground. In that sense an analogy may be made to the *Cushman* case, *supra*, indicating:

> A portion of the road. . . became overgrown with trees and brush.
> However, occasional use was made of the old road on the Barnes land after 1929 by horseback riders, by a farmer hauling corn from the Cushman land and by one person who drove an automobile over it.

*Cushman* found there had been no abandonment of the road, and I feel this is essentially the same situation. It should also be recollected that non-usage alone is not sufficient to constitute an abandonment; there must be

acts by the dominant owner showing an intention to abandon, *Obenchain, supra.*

The other contention is that there was an adverse use by the servient owners acquiesced in by the owner of the dominant estate. The evidence is wholly insufficient to show this. While a chain was put on the road, the key was given the dominant owner and there is no evidence at all to indicate this was a matter of grace. Nothing has been shown to establish that the dominant owners have not continued to use this roadway throughout the period of alleged adverse use by the dominant owners, sporadic though the use by the servient owners may have been. The mere fact that the dominant owners never went through with their plans to bulldoze the road certainly does not show an acquiescence in the closing of the road since they continued to use the road throughout the period. Although Mr. Forbush contends that he denied access to the property, when he testified he admitted that he simply asked the dominant users not to park up around his house but to park down along the right of way during the hunting season. The dominant users never claimed a right to cross up in the area of his house, and at his request did park down along the right of way.

(4) *Limitation of use.*

The servient owners attempt to limit the dominant owners to foot travel only, citing a prescriptive easement case, *Virginia Hot Springs Co.* v. *Lowman,* 126 Va. 424 (1919), as authority. Obviously whatever one acquires *by prescription,* as in *Lowman,* can only be established by the nature of the prescriptive use. When there has been a *grant* and the grant is of a "right of way for a road," the Court must imply the broadest kind of use of the road for ingress and egress. As a matter of fact, that use may change as the modes of travel change, from horses and wagons to motor vehicles. *Wagoner* v. *Jack's Creek Coal Corp.,* 199 Va. 741 (1958), as well as an increase in traffic caused by the subdivision of the dominant tract, *Cushman, supra,* at 253. As *Cushman* points out:

> When a right of way is granted over land, the servient estate, for the benefit of other land, the dominant estate, and the instrument creating the easement does not limit the use to be made

thereof, it may be used for any purpose to which the dominant estate may be then, or in the future reasonably devoted. This rule is subject to the qualification that no use may be made of the right of way, different from that established at the time of its creation, which imposes an additional burden upon the servient estate. *Ibid.*

**(5)** *Location of right of way.*

The Court finds that the right of way is located as shown on Mr. Brogan's plat. Portions of it have been relocated, but the evidence shows this was by agreement of the parties. *Wagoner* v. *Jack's Creek Coal Corp., supra*; *Conrad* v. *Strickler*, 215 Va. 454 (1975).

**(6)** *Width of right of way.*

In the Court's opinion this right of way is for a single-track roadway with the necessary drainage ditches. The evidence is insufficient to establish the exact width of the road at the various points and additional evidence may need to be taken on that point. Additionally, if contribution to maintenance is an issue, appropriate pleadings should be filed and evidence heard on that as well.